IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:19-cv-03683-DDD

ISAIAH ELIJAH SABALA,

    Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security

    Defendant.

---

**ORDER AFFIRMING ADMINISTRATIVE LAW JUDGE'S DETERMINATION THAT ISAIAH ELIJAH SABALA IS NOT ENTITLED TO DISABILITY BENEFITS**

---

Plaintiff Isaiah Elijah Sabala brought this action seeking judicial review of a February 19, 2019 determination by an Administrative Law Judge ("ALJ") that he is not entitled to benefits under the Social Security Act because he was not disabled and was, in fact, able to perform light work in the national economy. *See* 42 U.S.C. §§ 405(g). The matter is ripe for review. (*See* Docs. 11, 13, 17, 18.) For the reasons set forth below, the court affirms the ALJ's decision.

## BACKGROUND

Mr. Sabala was born with congenital heart defects and was later diagnosed with learning disorders and ADHD. Mr. Sabala received Supplemental Security Income benefits for much of his childhood. After Mr. Sabala reached the age of eighteen, the Social Security Agency notified Mr. Sabala that it was reviewing whether he remained disabled under the adult Supplemental Security Income regulations. (Docs. 11 and 11–1 through 11–14, Administrative Record ("AR") at pp. 54–56.) The

- 1 -

Agency subsequently found that Mr. Sabala was no longer disabled as of May 19, 2016; Mr. Sabala requested reconsideration; and an ALJ ultimately found, after a December 2018 hearing, that Mr. Sabala was not disabled. (*See* AR at pp. 1–47.) The Appeals Council denied review, and Mr. Sabala appealed the Agency's decision to this court. (AR at pp. 1–2, Doc. 1.)

## LEGAL STANDARD

A district court reviewing an ALJ's determination must determine whether the ALJ applied the correct legal standards and whether the ALJ's "factual findings are supported by substantial evidence." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014). Substantial evidence is "more than a scintilla, but less than a preponderance." *Id.* (internal citation omitted). The court must vacate an ALJ's decision on these grounds "if it is overwhelmed by other evidence in the record," but the court may not "reweigh the evidence nor substitute [its] judgment for that of the agency." *Id.* (internal citations and quotations omitted). While Social Security Rulings do not carry the force and effect of law, they are entitled to deference unless "they are plainly erroneous or inconsistent with the Social Security Act." *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (internal citation omitted).

## DISCUSSION

The ALJ in this case followed the familiar five-step sequential evaluation process to determine whether Mr. Sabala is disabled. At Step One, the ALJ will find that the claimant is not disabled if he is gainfully employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not gainfully employed, the ALJ moves on to Step Two and determines whether the claimant has a severe medical impairment. *Id.* § 404.1520(a)(4)(ii). If the

claimant has such an impairment, the ALJ moves on to Step Three and determines whether the impairment(s) meets the criteria for one or more of the specified medical conditions listed elsewhere in the regulations. *Id.* § 404.1520(a)(4)(iii). If such a listing is satisfied, the ALJ will find the claimant is disabled. *Id.* If not, the ALJ will conduct a subsequent intermediary step and determine the claimant's "residual functional capacity." *Id.* § 404.1520(a)(4). The ALJ will then apply that determined residual functional capacity to his or her analysis under Step Four or Step Five to determine whether the claimant can do his or her past work (Step Four) or other work available in the economy (Step Five). *Id.* § 404.1520(a)(4)(iv)-(v). If the claimant can perform work under either Step Four or Step Five, the ALJ will find that the claimant is not disabled and therefore not entitled to disability benefits. *Id.*

Mr. Sabala claims that the ALJ made legal errors at Step Three and in determining his residual functional capacity. He also claims that the ALJ's findings at Step Three and on his residual functional capacity were not supported by substantial evidence.

## I.   Alleged Step Three Failures

### A.   The Failure to Consider Listing 12.02 Does Not Merit Reversal

At Step Three in the Agency's five-step sequential evaluation, the Agency must determine whether a claimant's impairments meets or equals one of the Agency's listings. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Agency will find that the claimant is disabled. *Id.* Mr. Sabala first argues that the ALJ failed to consider Listing 12.02 for neurocognitive disorders at Step Three and failed to obtain medical expert testimony on that issue. The Commissioner admits that the ALJ failed to consider

- 3 -

Listing 12.02 explicitly but argues that this was harmless error because the ALJ made findings under a separate listing with identical criteria.

Under either Listing 12.02 (Neurocognitive disorders) or Listing 12.04 (Depressive, bipolar, and related disorders), disability is established only if either the "A" *and* "B" criteria are met *or* the "A" *and* "C" criteria are met. If Mr. Sabala failed to meet both the B- and C-criteria under both Listings, then he failed to establish that he is disabled under those Listings. Here, the B- and C-criteria for both the Listing considered (12.04) and the Listing not explicitly considered (12.02) are essentially identical.[1] *Compare* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02 *with* § 12.04. The ALJ determined that Mr. Sabala had two "moderate" limitations and two "mild" limitations under the B-criteria for Listing 12.04, falling short of the one "extreme" limitation or two "marked" limitations required to satisfy the B-Criteria. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B). (AR at p. 15.)  The ALJ also determined that Mr. Sabala failed to meet the C-criteria for Listing 12.04, noting that the record did not support a finding (1) that Mr. Sabala had minimal capacity to adapt to changes in his environment and (2) that medical treatment, mental

---

[1] The only difference in analyzing the two Listings might arise when evaluating the C-criteria, which hinges, in part, on whether there is a medically documented history of the existence of the disorder for a period of at least two years. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04(C); 12.02(C). For such an evaluation, the ALJ would need to look at the specific Listing disorder (*e.g.*, neurocognitive disorders rather than depression) to determine whether this criterion is satisfied. But the ALJ here based his C-criteria findings on the other mandatory criteria that look at the overall effects any particular disorder may have on the claimant (*i.e.*, whether a claimant has "marginal adjustment" to his environment and whether a "highly structured setting(s)" diminishes symptoms). Analysis under the disorder-dependent two-year criterion, therefore, was unnecessary to support the ALJ's ultimate finding that Mr. Sabala did not meet the either Listing's C-criteria.

health therapy, psychosocial support(s), or a highly structured setting(s) diminished symptoms of his mental disorder(s). (AR at p. 16.)

The ALJ's failure to do an explicit analysis under Listing 12.02, standing alone, does not merit reversal here because the ALJ analyzed the record under Listing 12.04's substantively identical B- and C-criteria. *Bernal v. Berryhill*, No. CV 16-1365 JAP/GBW, 2018 WL 2441154, at *3 (D.N.M. May 31, 2018) (finding that ALJ's failure to analyze head injury under Listing 12.02 was harmless error where ALJ analyzed head injury under Listing 12.04's B- and C-criteria).

### B.   Substantial Evidence Supported the ALJ's Step Three Findings

Mr. Sabala next argues that the ALJ failed to obtain sufficient medical expert testimony to determine whether Mr. Sabala satisfied a Listing. Mr. Sabala argues that Social Security Ruling 17-2p mandates consideration of medical expert opinion evidence because such evidence was determinative of Mr. Sabala's previous childhood claim.

The second half of Mr. Sabala's argument—that failure to incorporate findings from his childhood disability determinations merits reversal—fails. When the Agency redetermines disability at age eighteen, the Agency reviews the claimant as if he were a newly applying adult without deference to prior determinations, as Mr. Sabala concedes. *See* 20 C.F.R. § 416.987(b).

The first half of Mr. Sabala's argument appears to depend largely on a misreading of Social Security Ruling 17-2p. That ruling replaced Social Security Ruling 96-6p. Under the old, rescinded rule, expert medical evidence was required to "be received into the record" and given appropriate weight. SSR 96-6p, 1996 WL 374180 at *3. Under the replacement

rule, which appears to apply here,[2] ALJs must base "a finding *that an individual is disabled*" on findings or evidence offered by medical experts. SSR 17-2p, 2017 WL 3928306, at \*3 (emphasis added). But an ALJ need not obtain medical expert opinion evidence prior to making a Step Three finding that the claimant's impairment "*does not* medically equal a listed impairment" *if* the ALJ "believes that the evidence does not reasonably support" such a finding. *Id.* at \*4 (emphasis added).

Mr. Sabala's claim that SSR 17-2p "indicates that an ALJ's finding on the issue of medical equivalence must be based on certain defined medical evidence" is belied by the text of that policy statement. (Doc. 18 at p.4) A finding *in favor* of a claimant must be based on such evidence. But this is not an evenhanded regulation: a finding *against* the claimant need not be based on such evidence if the ALJ reasonably concludes that it is unnecessary. And the ALJ need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) *does not* medically equal a listed impairment." *Id.* at \*4 (emphasis added). The ALJ exceeded that low floor and appropriately evaluated Mr. Sabala's impairments under the B- and C-criteria of Listing 12.04 in light of the full record. (AR at pp. 15–16.)

Even if SSR 96-6p applied and the ALJ were required to consider such medical expert evidence, the ALJ did so. For instance, Dr. Douglas Hanze found that Mr. Sabala only had one "mild" limitation under Listing 12.04's B-criteria. (AR at p. 500.) He also concluded that the C-criteria were not satisfied for Listing 12.04. (AR at p. 501.) Dr. Mark Suyeishi made similar findings, finding that Mr. Sabala had no degree of limitation under any of the B-criteria and that the C-criteria were not met.

---

[2] The parties appear not to dispute that SSR 17-2p applies to Mr. Sabala's claim. (*See* Doc. 13 at p. 25.)

- 6 -

(AR at pp. 580–81.) The ALJ's decision to give these two doctors' opinions "little weight" does not undermine the ALJ's ultimate finding that Mr. Sabala's conditions did not meet a Listing or render that finding unsupported by substantial evidence, even under SSR 96-6p. (*See* AR 22–23.) The ALJ considered "the opinion given by one or more psychological consultants designated by the Commissioner" consistent with 20 C.F.R. § 416.926(c). The ALJ also relied on substantial other medical expert opinions in determining that Mr. Sabala did not meet a listing (*See* AR at pp. 15–16 (citing various evidence concerning Mr. Sabala's mental status, intellectual skills, cognitive ability, and memory).)

Regardless of the Listing considered, substantial evidence supports the ALJ's findings at Step Three that Mr. Sabala failed to meet the B- or C-criteria. For the B-criteria, Mr. Sabala argues that he has at least two "marked" limitations as required to find that he is disabled. A "marked" limitation for the relevant listings means that one's ability to function "independently, appropriately, effectively, and on a sustained basis" in the relevant area is "seriously limited." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(d). In contrast, a "moderate" limitation means such functioning is "fair." *Id.* § 12.00(F)(2)(c). When evaluating children, which does not directly apply to Mr. Sabala's claims here, a "marked" limitation constitutes functioning on standardized testing between two and three standard deviations below the mean (which would be approximately between the first and third percentiles assuming a normal distribution of scores). 20 C.F.R. § 416.926a(e)(2). The opinions of Dr. Hanze and Dr. Suyeishi support the ALJ's finding that Mr. Sabala had no "marked" limitations as discussed above. Mr. Sabala generally performed at average to low-average level on the testing listed in Dr. Wolfe's report, and only one score (for "Practical Composite" under the "Adaptive Behavior Assessment System-3") fell within the "marked"

standard deviation limitation value for children. (AR at pp. 543–44.) As Dr. Wolfe confirmed, Mr. Sabala's test scores across a range of areas, including cognitive functioning and adaptive functioning, were generally in the average to low-average range. (AR at pp. 544–45.)

Under the C-criteria, Mr. Sabala must show that either ongoing treatment or highly structured settings diminish his symptoms or that he has "marginal adjustment" to his environment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(G). Under the "marginal adjustment" analysis, one's adaptability to changes in daily life must be "fragile." *Id.* For example, an inability to function outside of the home without substantial psychosocial supports may meet this requirement. *Id.* Mr. Sabala appears to cite the same evidence listed above as establishing the C-criteria, noting that he depends on his mother for "many aspects of daily living." (*See* Doc. 13 at p. 24.) But the cited evidence from Mr. Sabala shows that he generally does not have issues with personal hygiene or feeding himself aside from "reminder on hygiene from parent." (AR at p. 223.) Dr. Wolfe attributed his lack of motivation to cook (other than with a microwave) or to clean his room to his mood, depression and anxiety. (AR at pp. 542–43.) Yet Mr. Sabala's job "helped his depression significantly" according to Dr. Yeung. (*Id.* at p. 586.) This and other substantial evidence support the ALJ's findings that Mr. Sabala did not have a "fragile" ability to adjust to changes in life or that a highly-structured environment was necessary to diminish Mr. Sabala's symptoms.

## II.    Residual Functional Capacity Analysis

Before moving on to Step Four or Step Five in the Agency's sequential evaluation process, the Agency must determine the claimant's "residual functional capacity." 20 C.F.R. § 404.1520(a)(4). That determination informs the Agency's determination at Steps Four or Five whether

the claimant can work in the economy. *Id.* § 404.1520(a)(4)(iv)-(v). Mr. Sabala argues that the ALJ's findings on his residual functional capacity merit reversal. Mr. Sabala argues that the ALJ (1) contradicted his own findings on Step Two and failed to consider Mr. Sabala's severe fatigue during the residual functional capacity analysis; (2) failed to give Dr. Yeung's opinion controlling weight pursuant to 20 C.F.R. § 416.927(c)(2); (3) failed to give sufficient weight to Dr. Wolfe's opinion; (4) impermissibly found that Mr. Sabala's and his mother's testimony were inconsistent with the record; and (5) failed to include other reasonable limitations to account for Mr. Sabala's migraines.

First, the ALJ did assess Mr. Sabala's fatigue during his residual function capacity analysis consistent with 20 C.F.R. § 416.945(a)(2) and ultimately found that Mr. Sabala was capable of light work despite limitations stemming from that fatigue. (AR at pp. 17–18.) The ALJ found specific limitations due to this fatigue, as Mr. Sabala concedes, including limitations for only "occasional rather than frequent postural activities," understanding simple but not complex instructions, and making simple but not complex work-related decisions. (Doc. 13 at p. 20.) As the Commissioner points out, other substantial evidence supported the ALJ's findings on fatigue limitations, including Mr. Sabala's own statements to Dr. Sever. (AR 462 (noting that Mr. Sabala primarily notices his easy fatigability when he exercises).) The ALJ appropriately considered Mr. Sabala's fatigue at this stage of the analysis, and substantial evidence supported his determination that Mr. Sabala nevertheless could do light work with specific limitations at Step Five.

Second, Dr. Yeung's opinion that Mr. Sabala should be able to "self-limit" does not constitute a controlling medical opinion that, therefore, Mr. Sabala was unable to perform full-time work. Pursuant to 20 C.F.R. § 416.927(b)(2), the ALJ generally must explain why he or she is not

giving controlling weight to a treating physician's "medical opinions." But the excerpted portion of Dr. Yeung's opinion does not necessarily qualify as a "medical opinion" under that regulation.[3] Perhaps more importantly, Mr. Sabala's argument takes this quote out of context and stretches its meaning too far. Dr. Yeung's full statement (which was adopted from another doctor) reads: "There is no need to limit Isaiah's activity or diet from a cardiovascular standpoint, although he should be allowed to self limit." (AR at pp. 431, 439.) If anything, the first half of that statement should be given controlling weight as a medical opinion. And these notes were made in the context of Mr. Sabala's discussion with his treating cardiologist about playing basketball with similarly-aged peers. (AR at p. 437.) Other portions of the record show that Mr. Sabala primarily noticed this fatigue while exercising but not when doing typical housekeeping chores. (AR at p. 462.) In context, Dr. Yeung's suggestion that Mr. Sabala should be able to "self-limit" does not constitute a controlling medical opinion mandating a finding of disability. The ALJ gave Dr. Yeung's overall medical opinions appropriate weight under the circumstances, and her opinion that Mr. Sabala should "self-limit" is consistent with the fatigue limitations that the ALJ found in his residual functional capacity analysis.

Third, the ALJ gave Dr. Kelly Wolfe's opinions appropriate weight. The ALJ appropriately discounted Dr. Wolfe's employment-related opinion that is ultimately reserved to the Commissioner. 20 C.F.R. §416.927(d)(1) (statement from a medical professional that claimant is

---

[3] Under that regulation, "medical opinions" include judgements about what the claimant "can still do despite impairment(s)." 20 C.F.R. § 416.927(a)(1). But the regulations further clarify that opinions from a medical source that a claimant is "unable to work" generally are not "medical opinions." 20 C.F.R. §416.927(d)(1). Such determinations are reserved for the Commissioner. *Id.* § 416.927(d).

giving controlling weight to a treating physician's "medical opinions." But the excerpted portion of Dr. Yeung's opinion does not necessarily qualify as a "medical opinion" under that regulation.[3] Perhaps more importantly, Mr. Sabala's argument takes this quote out of context and stretches its meaning too far. Dr. Yeung's full statement (which was adopted from another doctor) reads: "There is no need to limit Isaiah's activity or diet from a cardiovascular standpoint, although he should be allowed to self limit." (AR at pp. 431, 439.) If anything, the first half of that statement should be given controlling weight as a medical opinion. And these notes were made in the context of Mr. Sabala's discussion with his treating cardiologist about playing basketball with similarly-aged peers. (AR at p. 437.) Other portions of the record show that Mr. Sabala primarily noticed this fatigue while exercising but not when doing typical housekeeping chores. (AR at p. 462.) In context, Dr. Yeung's suggestion that Mr. Sabala should be able to "self-limit" does not constitute a controlling medical opinion mandating a finding of disability. The ALJ gave Dr. Yeung's overall medical opinions appropriate weight under the circumstances, and her opinion that Mr. Sabala should "self-limit" is consistent with the fatigue limitations that the ALJ found in his residual functional capacity analysis.

Third, the ALJ gave Dr. Kelly Wolfe's opinions appropriate weight. The ALJ appropriately discounted Dr. Wolfe's employment-related opinion that is ultimately reserved to the Commissioner. 20 C.F.R. §416.927(d)(1) (statement from a medical professional that claimant is

---

[3] Under that regulation, "medical opinions" include judgements about what the claimant "can still do despite impairment(s)." 20 C.F.R. § 416.927(a)(1). But the regulations further clarify that opinions from a medical source that a claimant is "unable to work" generally are not "medical opinions." 20 C.F.R. §416.927(d)(1). Such determinations are reserved for the Commissioner. *Id.* § 416.927(d).

"unable to work" does not constitute a "medical opinion"). (AR at pp. 546–47 (noting that Mr. Sabala may have difficulty obtaining employment).) For Dr. Wolfe's remaining opinions, the ALJ considered them with appropriate weight.[4] Dr. Wolfe's opinions were largely directed toward limitations in the college setting, and Dr. Wolfe found that Mr. Sabala may need a quiet place to take a test, a more limited course load, and extra tutoring help. (AR 546–47.) But not all of these accommodations would be necessary in the workplace and outside the rigors of higher education testing environments. And Dr. Wolfe's comments about difficulty finding work were attributable to Mr. Sabala's mood and depression, symptoms of which were "significantly" improved when he started working, according to Dr. Yeung. (AR at pp. 546, 586.)

Fourth, the ALJ adequately explained his finding that Mr. Sabala's and his mother's statements were not entirely consistent with other evidence in the record. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014). But the ALJ need not explicitly address each of a claimant's or the claimant's parent's statements to render a credibility finding reviewable. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012). Instead, the ALJ may contrast the claimant's statements with

---

[4] Mr. Sabala argues that Social Security Ruling 85-15 mandates a finding of disability or at least remand in this circumstance. 1985 WL 56857. Not so. That Ruling simply requires ALJs, among other things, to consider whether a claimant has suffered a "substantial loss of ability" to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting." *Id.* at *4. The ALJ did consider this issue and ultimately found that Mr. Sabala did have the capacity to handle simple instructions and work-related decisions despite his impairments.

other evidence in the record to demonstrate inconsistencies. *Id.* The ALJ did so here. For instance, the ALJ gave "partial weight" to Mr. Sabala's mother's report but also noted that he will "defer to the objective medical evidence . . . described above." (AR at p. 24.) That substantial medical evidence included opinions from multiple doctors that supported the ALJ's findings on Mr. Sabala's residual functional capacity. (AR at pp. 18–23.) So the ALJ's somewhat conclusory findings on Ms. Sabala's credibility (AR at p. 24 (noting that "unknown factors" may have colored her statements)), do not constitute reversible error because his statements were not "in the absence of a more thorough analysis" of the medical evidence. *Id.* at 1170. The ALJ also found that Mr. Sabala's statements about the intensity and limiting effects of his symptoms were "not entirely consistent with the medical evidence." (AR at p. 18.) The ALJ then cited substantial evidence in the record that reflected Mr. Sabala's capacity for light work despite his fatigue and other limitations. (AR at pp. 18–23.) Like the ALJ in *Keyes-Zachary*, the ALJ here appropriately contrasted medical evidence with the claimant's and the claimant's mother's testimony while giving that testimony appropriate weight.[5] *Id.* at 1170.

Finally, Mr. Sabala argues that the ALJ failed to consider his migraines in determining his work limitations. Indeed, "when determining the RFC, the ALJ was required to consider the limiting effects of all impairments, even the mental impairments he found not severe at step two." *McCaffrey v. Astrue*, No. 10-CV-01943-PAB, 2011 WL 4536980, at

---

[5] The ALJ's analysis also was consistent with Social Security Ruling 16-3p which requires consideration of the claimant's testimony about his or her symptoms. 2017 WL 5180304, at *6. That Rule appears not to require evidence from family members where an adult claimant's impairment does not prevent him or her from describing symptoms adequately. *See id.*

*11 (D. Colo. Sept. 30, 2011). But the ALJ here considered evidence of Mr. Sabala's migraines when determining his residual functional capacity and made a finding that Mr. Sabala was suited for light work. (*See* AR at p. 18 (considering Mr. Sabala's migraine symptoms and treatment with over-the-counter medicine).) Mr. Sabala claims that a vocational expert found that random breaks for unpredictable migraines would be inconsistent with competitive work. (Doc 18 at p. 11.) But the hypothetical scenario counsel posed to that expert at the hearing was that the claimant had to take breaks lasting "at least" five to ten minutes every hour of every day. (AR at p. 46.) Mr. Sabala has not claimed that he has headaches every hour of every day.

Indeed, while Mr. Sabala claims he has "daily headaches" (Doc. 18 at p. 34), the cited record is somewhat inconsistent on that issue. Mr. Sabala reported having headaches "once weekly" in 2015 (AR at p. 388) but also reported "migraines almost every day" in March 2016 (AR at p. 509). Yet another evaluation in March 2016 suggested that the migraine-type headaches occurred "approximately once a week." (AR at p. 462.) At the hearing in 2018, Mr. Sabala testified that he had migraines or headaches "pretty much" every day (AR at pp. 38–39) that, coupled with his fatigue, necessitated frequent breaks at work (AR at pp. 37–39). While the ALJ's limitations primarily focused on Mr. Sabala's fatigue (AR at p. 17 (limiting Mr. Sabala to "occasional postural activities" and "simple" instructions/work-related decisions)), those limitations also could accommodate occasional headaches or migraines. And Mr. Sabala appears not to have cited medical evidence of his treatment for migraines or headaches since March 2016, two months before the time that the ALJ found that Mr. Sabala's disability had ended (May 2016). The ALJ appropriately considered the available evidence on Mr. Sabala's migraines, and substantial evidence supported the ALJ's findings.

## CONCLUSION

The ALJ either applied the correct legal standards or committed only harmless error in misapplying any legal standards. The ALJ's findings, including the ultimate finding that Mr. Sabala was capable of light work with certain limitations, were supported by substantial evidence. The ALJ's decision therefore is AFFIRMED.

DATED: November 25, 2020             BY THE COURT:

Hon. Daniel D. Domenico